# EXHIBIT 2

IN THE MATTER OF THE ARBITRATION
BETWEEN

| | | |
|---|---|---|
| AIRLINE PROFESSIONALS ASSOCIATION, TEAMSTERS LOCAL 1224 | ) ) | |
| Union, | ) ) | **OPINION AND ORDER** |
| and | ) ) | |
| HORIZON AIR INDUSTRIES, INC. | ) ) | |
| Employer, | ) ) | |
| Grievant: First Officer Brian Milam | ) | |

BEFORE:

Cliff Freed, Neutral Arbitrator

Lawrence Freer, Union Board Member

Daniel Scott, Company Board Member

February 11, 2013

**REPRESENTATION**

FOR THE UNION:

Christopher S. Peifer
Barkan Meizlish LLP
250 East Broad Street 10th Floor
Columbus, Ohio 43215

FOR THE EMPLOYER:

Mark Hutcheson
Davis Wright Tremaine LLP
1201 Third Ave Suite 2200
Seattle, Wa. 98101-3045

## I.   PROCEEDINGS

Airline Professional Association, Teamsters Local 1224 (the "Union") initiated this grievance on behalf of its member First Officer Brian Milam ("Milam" or "Grievant"). The grievance was brought pursuant to the terms of the collective bargaining agreement ("Contract" or "Agreement") between the Union and Horizon Air Industries, Inc. ("Horizon" or "Company") that was in effect both at the time of the grievance and hearing. Horizon is a regional airline that operates daily flights in the Western United States. The Contract covers Horizon pilots.

The neutral arbitrator was Cliff Freed, chosen by agreement of the parties. The Union's Board Member was Larry Freer, and the Company Board Member was Daniel Scott. The hearing was held on September 11, 2012 in Tukwila, Washington. The Union was represented by Christopher Peifer of Barkan Meizlish LLP, Columbus, Ohio, and Horizon was represented by Mark Hutcheson of Davis Wright Tremaine LLP, Seattle Washington. At the hearing, both sides had an opportunity to make opening statements, submit documentary evidence, examine and cross-examine witnesses who testified under oath, and argue the issues in dispute. The Grievant attended the entire hearing and testified. The hearing record was closed on September 11, 2012, and the post-hearing briefs were received by the neutral arbitrator on November 2, 2012.

## II.   STATEMENT OF THE ISSUE

The parties stipulated to the following issue: Was there cause for Horizon Air to discharge the Grievant on November 21, 2011, and if not, what shall be the remedy?

## III.   STATEMENT OF FACTS

There are very few disputed facts surrounding this arbitration. Horizon is a regional passenger carrier operating daily flights in the Western Unites States. As a common carrier, it is regulated by the Federal Aviation Administration ("FAA") and the Department of Transportation ("DOT"), both of which require that employees in a safety-sensitive position be tested for drugs and alcohol. Although there are a plethora of regulations surrounding this testing, they are not

and alcohol. Although there are a plethora of regulations surrounding this testing, they are not necessarily at issue in this case. Rather, Horizon complies with the FAA/DOT drug-testing requirements through its Integrated Drug and Alcohol Program ("IDAP"). The IDAP states, *inter alia*, that "the use, sale, transfer, possession or presence in one's system of any controlled substance (except medically prescribed drugs) by any safety sensitive employee while on company premises, engaged in company business, operating company equipment, or while under the authority of Horizon Air is strictly prohibited. Disciplinary action will be taken as necessary, up to and including termination."

First Officer Brian Milam was hired by Horizon in January of 2004. His work history will be discussed *infra*. On November 4, 2011, Milam was scheduled to first fly a roundtrip from Seattle to Redmond, Oregon, which had a report time of 10:25 a.m., and then a roundtrip from Seattle to Spokane and back. Upon completion of the first roundtrip, he was notified that he was to be subjected to a random drug test, to which he submitted. There is no dispute that the test was administered appropriately. After providing his specimen, Milam completed the Seattle to Spokane roundtrip. He was in the cockpit for all flights, but the captain did the flying on all legs of both roundtrips. Upon returning to Seattle, Milam called in sick for the remaining days of his schedule through November 7th, and then again through November 13th.

Milam now acknowledges that for approximately six months prior to this time, he had been using marijuana to "cope with [his] issues." Those issues include chronic back pain that resulted in two surgeries per year since approximately 2009; chronic sinusitis; and difficulties associated with his wife's thyroid disorder, high-risk pregnancies, and post-partum depression. Milam testified that he never used the drug while on duty; that if his report time was early in the morning he would not typically use the drug the day before; and that if his trips were afternoon trips he would typically use it the night before just prior to going to bed. Milam admits to using marijuana around 7 p.m. on November 3, 2011, the evening before his November 4 flight to Spokane.

Although the testimony in this regard is a little ambiguous, Milam immediately anticipated issues arising as a result of his submission to the drug test. He didn't remove himself from service after the sample was first taken because it "didn't quite hit [him] yet, the gravity of what had just happened." But he acknowledges calling in sick *because* of the drug test upon his arrival in Seattle after the Spokane leg of the trip. Milam further scheduled an appointment with Mathew Comrie, a mental health provider[1], because he "knew he needed help and [he] wanted to get it." Milam scheduled this appointment sometime prior to November 17, 2011.

On November 14, 2011, a confirmation test was conducted on Milam's specimen and it was confirmed that he had tested positive for marijuana. At some point thereafter Horizon was notified. On November 17, 2011, Horizon provided to Milam a letter advising him that as a result of the drug test, he was in violation of Federal regulations, and would be unable to perform any DOT/FAA safety sensitive duties for any employer until he completed a Substance Abuse Professional (SAP) evaluation. The letter attached a list of three local SAPs, including David Pearlman, whom Milam subsequently contacted.

On November 21, 2011, Milam was summoned to a meeting by Horizon. The meeting was conducted by Seattle Assistant Chief Pilot Gordon Smith, who was asked by Horizon Chief Pilot LaMar Haugaard to represent the Company. Also in attendance was Chris Lewless, Horizon's Managing Director for People and Labor Relations, and Dan Johnston[2]. The Union's counsel, Chris Peifer, also appeared by telephone.

The meeting did not last long; no more than 15 minutes. Mr. Smith discussed with Milam and Mr. Peifer the fact that there was an option under FAA/DOT regulations, and also under the IDAP, to have a testing of a split specimen to confirm the original drug test finding. Milam responded there was no need to do so. Milam was handed a letter terminating his employment. In its totality, the text of the letter stated:

---

[1]   Milam testifies that Comrie was a "psychotherapist, a local psychologist."
[2]   Mr. Johnston's role is not clear from the record.

> Horizon Air was informed on Monday, November 14, 2011 that you
> had tested positive on a random drug test.  It is the policy of Horizon
> Air that the use, sale, purchase, transfer, possession or presence in one's
> system of any controlled substance (except medically prescribed drugs)
> by any safety sensitive employee while on the company premises,
> engaged in company business, operating company equipment, or while
> under the authority of Horizon Air is strictly prohibited.  This letter is
> to inform you that your employment at Horizon Air is terminated
> effective November 21, 2011.

The letter was signed by Mr. Smith, who acknowledged that in drafting the letter, he "cut and pasted" the text from the "Introduction Statement" of the IDAP.

Prior to terminating Milam, Mr. Smith reviewed two "action log entries," which are electronic files that document some aspect of an employee's performance.  The acronym for the system maintaining these documents is POSSUM, and for shorthand purposes the entries are called POSSUM entries.  The first POSSUM entry reviewed by Mr. Smith was dated July 26, 2010, and was made by Mr. Smith.  It occurred after the airline had conducted an audit of sick leave usage by pilots, and identified Milam as among the biggest users system-wide.  The entry was entitled "Reliability Discussion," and addressed the "excessive sick leave" taken by Milam during the last 12 months.  In the entry, Mr. Smith noted that Milam had issues with his back that precluded flying; that Milam had provided explanations for the absences; and that Mr. Smith "appreciate[d] the conversation."  The parties agree that this discussion was not disciplinary in nature.

The second POSSUM entry reviewed by Mr. Smith was dated September 2, 2011 and was also entitled "Reliability Issue."  Like the first entry, it followed on the heels of an audit for the period June 6, 2010 through May 21, 2011 in which Milam was identified as the pilot having taken the most sick leave for that period.  Milam and Mr. Smith tried to work out a meeting to discuss this issue; Milam understood the meeting to be disciplinary and wanted Union representation.  Owing to everyone's respective schedules the meeting did not occur prior to

Milam's termination in November of 2011. The entry notes, and Mr. Smith confirms, that had the meeting occurred, the company intended to issue a "written verbal warning." [3]

Mr. Smith reviewed no additional information prior to terminating Milam. In particular, he did not review Milam's personnel file or training file, nor did he review three letters of recommendation he'd written for Milam while Milam was applying for other positions, including at other airlines. In the letters, Mr. Smith speaks to Milam's "professional and mature attitude," notes his "positive attitude and personality that makes working with him on a daily basis a pleasure," and recommends him as "a quality individual that merits your positive consideration." The last letter to Southwest Airlines was written on March 10, 2011, after the first POSSUM entry but prior to the second. Mr. Smith also did not interview Milam prior to the termination meeting. There is little testimony about what actually was stated by either side at the meeting, but both sides agree that Horizon made no effort to offer any kind of assistance to Milam, nor did Milam make any such request of assistance, either prior to his termination, or during the termination meeting.

As noted above, prior to receiving the termination letter Milam contacted Dr. Comrie. Ultimately, he voluntarily entered into therapy and attended somewhere between 15-20 sessions with Dr. Comrie. After the termination, he called David Perlman, who is a U.S. Department of Transportation trained and qualified substance abuse professional. Mr. Perlman's name was one of the three names of SAPs provided Milam by Horizon when he received notice that he'd failed the drug test. Milam met with Mr. Perlman on November 29th, during which time, according to Mr. Perlman, Milam was honest and forthcoming in the information he provided. Mr. Perlman diagnosed Milam as suffering from cannabis abuse, the lowest level diagnosis on the DSM-IV scale. Mr. Perlman referred Milam to treatment, including a one-time marijuana awareness class, and then a three to six month course of individual counseling with Robin Swailes. Mr. Perlman

---

[3]  The Board notes that had the discipline been issued, Milam would have had the right to explain his situation and potentially grieve the discipline. The status of the entry as discipline or non-discipline is not at issue in this case, though.

issued an initial evaluation and recommendation on November 30, 2011, which he sent to Horizon. At some point in this time period he also spoke on the phone with Christopher Lewless, who had identified himself to Mr. Perlman as Horizon's Designated Employee Representative for purposes of providing information necessary to understand the Company's handling of its drug testing policies.

Milam satisfactorily followed the treatment plan, and Mr. Perlman had a follow-up evaluation with him on April 3, 2012. After meeting with Milam and reviewing Ms. Swaile's monthly written reports[4], Mr. Perlman issued a "Follow-up Evaluation/ Notice of Compliance" report to Horizon in which he states that Milam was "rated at a low risk of continued use, does not present an imminent risk or liability at the workplace and may return to work at this time, subject to MRO review and FAA suspension requirements." Additionally, Mr. Perlman adjudged it unnecessary for Milam to participate in an aftercare program. Mr. Perlman sent the report to Horizon.

At the hearing, Horizon's Chief Pilot LaMar Haugaard testified that he retrospectively reviewed Milam's attendance record for the period October 19, 2008 through his termination. Captain Haugaard testified that Milam's attendance record was "ghastly," "atrocious" and an embarrassment. Captain Haugaard testified that it did not appear to him, based on the records he reviewed, that Milam had ever provided Horizon with a full month of scheduled flying.[5] Captain Haugaard also testified that Milam is the only Horizon pilot to fail a random drug test, although other safety-sensitive employees had done so.

---

[4]  Mr. Perlman testified that he initially had weekly telephone conversations with Ms. Swailes to discuss the patients, and she also provided periodic status reports. At the end of twelve weeks of counseling, she deemed Milam stable and felt no further counseling was necessary; Mr. Perlman recommended another approximately six weeks.

[5]  It's not clear to the Board whether Captain Haugaard was saying that Milam had never in his career provided a full month of scheduled flying, or had not done so just for the review period of Exhibit 15, which begins in October of 2008, approximately four years after Milam had been employed by the Company. In its brief, Horizon suggests he was stating the latter.

While employed by Horizon, Milam had no accidents or incidents, and was not disciplined.[6] His personnel file included one Letter of Recognition (issued both to him and Captain J. Jonsson) for operating an aircraft in difficult conditions. Milam attributed his attendance record to the medical issues described above, and estimated that for the period April 2009 through July 2011 he had approximately 26-31 office visits for his sinusitis and chronic back injury; approximately 30-40 office visits with his wife regarding her pre- and post-pregnancy concerns, and that he had to stay home to watch his children approximately 75-100 times while his wife was struggling with complications of pregnancy and childbirth. Milam was initially unaware of any rights to which he might have been entitled to under the Family and Medical Leave Act, but was ultimately advised by the Union and in July of 2011 he was granted the use of intermittent leave only with respect to his wife's medical issues. He did not request such use for his own medical issues.

## IV.   DISCUSSION

### A.   Quantum of Proof.

It is well established that in a discharge case, the burden of proof lies with the employer. In some cases, an arbitrator will apply a heightened standard of proof, most often in cases where criminal or stigmatizing behavior is concerned. While that kind of conduct is involved here, the engagement in stigmatizing behavior is not in dispute and thus not subject to scrutiny. Milam candidly admits his transgression. Rather, the issue is whether there exists some other basis to overturn Horizon's decision, notwithstanding Milam's conduct. In these circumstances, Horizon's burden is to show, by a preponderance of the evidence, that there was cause to terminate Milam.

---

[6] As noted above, prior to his termination Horizon had intended to issue a written warning regarding his attendance.

- 8 -

**B.      Was There Just Cause to Terminate Milam?**

Milam violated not only Horizon's drug and alcohol policy, he also violated a trust that exists between Horizon and its customers, who depend upon Horizon pilots to ensure their safety as they are transported from place to place. There is little ambiguity surrounding the drug-free mandates for safety sensitive employees, especially airline pilots. Both Horizon and the public have a right to rely upon the assumption that pilots are drug-free. There is nothing hypothetical or attenuated about the disastrous impact that an impaired pilot can have on the lives of his or her passengers, and therefore there is little room for compromise in any discussion regarding drug use by a pilot. For these reasons, it is relatively easy to summarily dismiss at least one of the arguments made by the Union.

The Union argues that Mr. Smith testified that in terminating Milam he relied at least partially on the prohibition in the IDAP against drug use while on duty, and Horizon has not established that Milam did so or that he was even impaired while on duty. Thus, the Union argues, Horizon has not met its burden. It may be true that Horizon has not established that Milam was impaired while on duty, but there is no doubt Milam was terminated under the policy prohibiting "the presence in one's system of any controlled substance" while on Company premises, engaged in Company business, or operating Company equipment. The termination letter relies upon that language as the basis for termination, and Mr. Smith also testified that that provision served as the basis for termination. To the extent that Mr. Smith thought that Milam may actually have been impaired and that could serve as an additional basis for termination, it does not negate the fact that under the IDAP the mere presence of marijuana in one's system is itself a sufficient basis for termination.

Thus, any discussion of whether Milam was impaired or not is irrelevant, especially given the policy considerations underlying Horizon's policy. While indeed it is quite feasible that Milam was not impaired at any time on November 4, 2011, his positive drug test alone is a violation of the IDAP and constitutes a basis for termination.

The parties do not dispute that the IDAP is the relevant document controlling Milam's fate. That policy provides that prior to an employee testing positive for drugs, he or she may seek treatment through the Employee Assistance Program and maintain their job while pursuing treatment options. Otherwise, the policy states that an employee failing a random drug test will be "offered a last chance agreement if consistent with SAP recommendations and a review of company records supports retention of the employee as being in the best interest of Horizon Air." (Emphasis in original). An employee will not be offered reemployment unless *both* conditions are met. The heart of this matter is whether Horizon complied with that provision in terminating Milam.

Horizon argues that it did so. It states that the SAP did not recommend retention with a last chance agreement. Rather, it takes the position that Mr. Perlman's recommendation was equivocal; that although he suggested Milam was ready to return to duty, it didn't necessarily mean that he was recommending him for employment with Horizon. That, Mr. Perlman stated, was up to the Company, and not him. And that is, to a point, what Mr. Perlman said.

In making this argument, though, Horizon does not accurately set forth its own test. Nothing in the language of the policy, or in the testimony of the witnesses, states that the SAP must recommend retention with a last chance agreement. Rather, the offering of a last chance offering must only be consistent with the SAP recommendations. I believe that to be the case here.

Mr. Perlman stated, among other things, that he was doing what was necessary to return Milam to flight status, and not necessarily returning him to duty with a specific employer. In doing so, he released Milam to work stating that Milam was "rated at a low risk of continued use, does not present an imminent risk or liability at the workplace and may return to work at this time, subject to MRO review and FAA suspension requirements." Additionally, Mr. Perlman adjudged it unnecessary for Milam to participate in an aftercare program, the implication of which is that there was little ambiguity in his mind about Milam's readiness to return. All of these facts are consistent with a return to work with a last chance agreement.

To the extent that Mr. Perlman's recommendation was not clear, Horizon certainly had the ability to communicate with him to clarify any questions regarding Milam's readiness to return and the value of a last chance agreement. Mr. Perlman spoke with Mr. Lewless and sent him his initial evaluation and subsequently his "Follow-Up Evaluation and Notice of Compliance." Horizon chose not to make further inquiry.

Having found that the SAP's recommendations are consistent with a last chance agreement, the next question before the Board is whether the second component of the conjunctive "retention" test is met: whether "a review of company records supports retention of the employee as being in the best interest of Horizon Air." If it does not, Milam was appropriately terminated, even if the SAP's recommendations are consistent with retention.

The Company argues that "Horizon's discretion controls whether an employee who fails a drug test will continue to be employed." The Board agrees with the Company that in the first instance it is the Company's call to determine whether Company records support retention as being in the best interest of Horizon Air, and that Horizon is uniquely qualified to making a determination as to what its interests are and how and by whom they are best served. Great deference should be accorded that determination. As noted by the Company, when the employer has acted in good faith, many arbitrators will not substitute their judgment for the judgment of the employer.

In this case, the Board does not find that Mr. Smith or Horizon acted in bad faith. Milam had a dismal attendance record, and reviewing the POSSUM records as Mr. Smith did, one can easily agree with him that such a record could not be countenanced, and Milam should not be retained. In these circumstances, ordinarily the Board would not reverse Horizon's determination. But there is one additional factor to be considered.

Horizon's IDAP mandates that before terminating an employee for a positive drug test, company records are to be reviewed. While the language of the IDAP does not state "all records," common sense dictates that certainly all relevant records must be reviewed in order to make a reasonable and good faith determination with respect to the employee's career. It would

be neither fair nor reasonable to allow the employer to cherry pick those records upon which it chooses to make a potentially career-ending decision against the employee.

In this case, Mr. Smith reviewed only the POSSUM records containing the two absence entries. As noted by the Union, he did not review Milam's training records and personnel files. While there is not a significant amount of additional material in either, there is certainly nothing negative and there are a few positive entries, including letters of recommendation written by Mr. Smith to another airline, and evidence of Milam's accident and incident-free career. The Board makes no determination as to whether had the Company reviewed the entire file, it would have arrived at exactly the same conclusion. Certainly it might have, and had it done so, it would have been a different case from the one before the Board.

What is clear to the Board is that Mr. Smith did not have a complete record before him when he made his determination. The Company may fairly note that it had the single most relevant information — Milam's extraordinarily bad attendance record — and that by itself was sufficient; that it could not have been overcome by any additional information. However, the Board finds that fairness, industrial due process and the Company's own IDAP require more. It owes it to the employee and the Company itself to make a good faith determination based on everything it knows. While we will never know for sure, it is a possibility that a review of all the records (including a more than cursory review of the attendance records establishing that at least some of Milam's absences were FMLA-related)[7] would have led to another conclusion. In this case, the Company's failure to consider the entire record is sufficient to find that Milam was not terminated for cause.

"Arbitrators will, in many cases, refuse to uphold management's actions where it failed to fulfill some procedural requirement specified by the agreement." Elkouri & Elkouri, *How Arbitration Works* 968 (6th ed. 2003). On the other hand, if the company essentially complied

---

[7] The record is not clear that a review of all the relevant records would have led to an inquiry regarding the underlying reasons for Milam's absences, and so although the Board notes that possibility, it also notes that a review of *any* of the additional records not reviewed by Mr. Smith could have led him to an alternative determination.

with the spirit of the requirement, and the employee was not otherwise impacted by management's failure to comply, an arbitrator may deem it to be a "no harm, no foul" situation, and uphold the discipline. *Id.* This is a close call, because certainly Milam's attendance was a legitimate and glaring deficiency in his employment history, and would have been a sure focus by anyone independently reviewing his record. Moreover, Mr. Smith was Milam's supervisor and was generally familiar with his record. Still, this Board cannot say that a review of *all* of Milam's relevant records would have surely led to the same result. Given that discharge and not some lesser fate was at issue, the severity of the penalty required Horizon's strict compliance with the standards it imposed upon itself in promulgating the IDAP.

To be clear: the Board's decision is very narrow. This decision does not constitute a "get-out-of-jail free" card to any pilot failing a drug test. To the contrary, it holds only that in not considering Milam's entire record on this one occasion, Horizon failed to abide by the terms of its own drug policy. The Board well-recognizes that had Horizon just considered the entire record, deference would have been accorded its determination, and that a decision to terminate Milam on the full record may very well have resulted in a different decision from the one arrived at by the Board today. The facts of this case do not diminish the deference that will usually be accorded the Company under the IDAP policy.

The Board considered, to a much lesser degree, one other factor in arriving at its decision, and that was the personal circumstances giving rise to Milam's drug use. While this decision was reached on very narrow grounds, the Board notes that Milam's use of marijuana, while absolutely unjustified given his position, was not recreational and was rooted in his documented physical and emotional discomfort. Appropriately, Milam made no excuses for himself, and the Board does not seek to provide him one. Yet, a large number of Milam's absences were predicated upon legitimate illnesses and surgeries that had some protections under the law. While Milam was at fault for failing to appropriately address his circumstances both with the Company, himself and his family, his were not the acts of someone putting his own pleasure before higher obligations, as is often the case when drugs are involved.

The Union makes another argument that the Board has not yet discussed. It argues that Milam was denied due process because he never received a copy of the 2010 IDAP, the policy relied upon by Horizon in terminating him and relied upon by the Board in reversing Horizon's decision. In light of the decision today, it is not necessary to address this alternative approach. Still, the Board feels compelled to make some comments that cut both ways. Milam was subjected to drug testing as a condition of employment, he received orientation in Horizon's drug testing policy when he was hired on, and the current policy was at least available to him, although he may not have received notice of it. The Board cannot help but comment that given the above and particularly in today's environment it is inconceivable that Milam was not on notice that he was subject to random testing, and that a positive drug test could lead to termination. His use of marijuana placed Horizon and its passengers in significant jeopardy, placed Milam's career in jeopardy, and the 2010 IDAP was not likely necessary to inform Milam of those facts.

On the other hand, the IDAP is a fairly detailed policy, and the Company should have done everything to ensure that it was received by all its employees so they understood the nuances of Horizon's drug and alcohol policy. In particular, knowledge of the Company's EAP program and the safe harbor it can provide may have been helpful information to Milam. While it may be possible that this information was earlier provided to him in the orientation training or otherwise, in another case or other circumstances the fact that the employee does not appear to have received the relevant IDAP may have more importance in the next Board's decision.

## C.     What is the Appropriate Remedy?

Having found that Milam was not terminated for cause, the appropriate remedy is the remaining question. The Board is influenced by the nature of Milam's conduct and the overwhelming public policy concerns prohibiting drug use among safety-sensitive employees. As mentioned several times throughout this opinion, Milam and Horizon have a sacred responsibility to the public, and Horizon has every right to establish — within the confines of the law — a drug and alcohol policy that ensures, to the best of its abilities, that every Horizon pilot

is operating uninfluenced by drugs or alcohol. As the Company points out, Milam violated this trust.

It is only by virtue of Horizon's slender failure to adhere to the terms of its own policies that Milam will be able to return to his position with Horizon. One could argue that Horizon's reliance on Milam's poor attendance was misplaced, given the reasons for his missing work so frequently, and Milam should not bear those consequences. Even if that were the case, however, Milam is not without fault. First, he failed to keep the Company informed with respect to his many personal and medical issues. Had he done so, there were other avenues of redress available to him that could have caused all of these circumstances to go in a different direction. Moreover, attendance records as poor as Milam's place stress not only on the Company's operations, but on his fellow pilots as well. Additionally, and as noted elsewhere, there is a possibility that had the Company reviewed Milam's entire record, he may still have been denied retention.

Given the narrow nature of this decision, the Board finds that the appropriate remedy is that Milam be reinstated to employment with a last chance agreement [8] and full benefits and seniority, but without back pay. In addition, Milam will need to obtain all necessary certifications required, including a current medical certification on file with the FAA, and will not be eligible for reinstatement until he has provided such to Horizon. Finally, Milam should provide Horizon, at his expense, an updated Follow-Up Evaluation and Notice of Compliance from an SAP. While this may seem extraordinary given that Mr. Perlman has already deemed Milam fit to return-to-duty, the length of time since the last report, and the safety-sensitive nature of the job, suggest that such caution is warranted under the circumstances. Once Milam is ready for reinstatement, he should be placed in the next available training or re-qualifying class.

---

[8] The Board will not dictate the terms of the last chance agreement. Given that such an agreement is contemplated as a necessary component of retention under the IDAP, the Board assumes that either a standard last chance agreement is in place, or alternatively the IDAP contemplates the parties will negotiate its terms. The Board will retain jurisdiction for 60 days in the event of a dispute with respect to implementation.

Cliff Freed
Neutral Board Member


Larry Freer                    Concurring_____         Dissenting_____
Union Board Member


Daniel Scott                   Concurring_____       Dissenting_____
Company Board Member

Cliff Freed
Neutral Board Member

Larry Freer                    Concurring  X              Dissenting _____
Union Board Member


Donald Scott                   Concurring _____       Dissenting _____
Company Board Member

- 16 -

Cliff Freed
Neutral Board Member


Larry Freer                          Concurring_____                    Dissenting_____
Union Board Member

Daniel Scott                         Concurring_____                 Dissenting_____
Company Board Member

- 16 -

IN THE MATTER OF THE ARBITRATION
BETWEEN

| | | |
|---|---|---|
| AIRLINE PROFESSIONALS ASSOCIATION, | ) | |
| TEAMSTERS LOCAL 1224 | ) | |
| Union, | ) | **ORDER** |
| | ) | |
| and | ) | |
| | ) | |
| HORIZON AIR INDUSTRIES, INC. | ) | |
| | ) | |
| Employer, | ) | |
| | ) | |
| Grievant: First Officer Brian Milam | ) | |

The Board, in arriving at this decision, has reviewed all of the evidence, exhibits, and transcripts of the hearing, and has considered the arguments of the parties as set forth in the post-hearing briefs. In view of all of the evidence and for reasons set forth in this Opinion, it is the decision of the Board that the discharge of First Office Brian Milam was not for cause. Accordingly, the Board orders that the grievance shall be sustained, and that Milam be reinstated to employment with a last chance agreement and full benefits and seniority, but without back pay. In addition, Milam will need to obtain all necessary certifications required, including a current medical certification on file with the FAA. Finally, Milam should provide Horizon, at his expense, an updated Follow-Up Evaluation and Notice of Compliance from an SAP. The Board will retain jurisdiction for 60 days in the event of any dispute with respect to implementation of any remedy.

Cliff Freed
Neutral Board Member

February 11, 2013